# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

ELTON R. KERR,

               Plaintiff,          :        Case No. 3:07-cv-297

     -vs-                             Magistrate Judge Michael R. Merz

                                   :

WILLIAM W. HURD, et al.,

               Defendants.

---

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

---

This case is before the Court on Motions for Summary Judgment of Defendants Wright State Physicians (Doc. No. 83) and William W. Hurd (Doc. No. 84). Plaintiff Van Noy Culpepper, Trustee in bankruptcy for Dr. Elton R. Kerr, opposes the Motions (Doc. No. 100) and each moving Defendant has filed a reply in support (Doc. Nos. 111, 112).

The parties have unanimously consented to plenary magistrate judge jurisdiction under 28 U.S.C. § 636(c) and the case has been referred on that basis (Doc. Nos. 5,6). Thus the Magistrate Judge is authorized to decide these two motions.

Plaintiff asserts subject matter jurisdiction under 28 U.S.C. § 1331 for claims arising under federal law, with supplemental jurisdiction under 28 U.S.C. § 1367 for state law claims. (Complaint, Doc. No. 1, ¶ 2.) Alternatively, Plaintiff asserts subject matter jurisdiction under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000. The Court finds that it has jurisdiction under both § 1331 and § 1332, which is uncontested.

**Generally Applicable Law**

Most of Dr. Kerr's claims arises under Ohio common law. Where state law creates the cause of action, state substantive law provides the rules of decision. 28 U.S.C. §1652; *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), overruling *Swift v. Tyson*, 41 U.S. 1 (1841). In applying state law, the Sixth Circuit follows the law of the State as announced by that State's supreme court. *Ray Industries, Inc. v. Liberty Mut. Ins. Co.*, 974 F.2d 754, 758 (6th Cir. 1992); *Miles v. Kohli & Kaliher Assocs.,* 917 F.2d 235, 241 (6th Cir. 1990). On the other hand, if "a rule really regulates procedure, -- the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them,"– then the federal procedural law, including the Federal Rules of Civil Procedure the will apply regardless of the basis of jurisdiction. *Sibbach v. Wilson*, 312 U.S. 1, 14 (1940). Allocation of the burden of proof is a matter governed by state law. *Safeco Ins. Co. of America v. City of White House, Tennessee*, 191 F.3d 675 (6th Cir. 1999).

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970). Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (emphasis in original). Summary judgment procedure

is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed. R. Civ. P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989). If, after sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate. *Id.* The opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-50, 106 S. Ct. at 2510-11 (citations omitted). "The mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp*., 964 F.2d 577, 582 (6th Cir. 1992)(quoting *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir. 1986). Therefore a court must make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than de minimis. *Hartsel v. Keys*, 87 F.3d 795 (6th Cir. 1996). "On summary judgment," moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962). Thus, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249, 106 S. Ct. at 2510.

The moving party

[A]lways bears the initial responsibility of informing the district court

> of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323; *see also, Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (citation omitted). The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Alexander v. Caresource,* 576 F.3d 551 (6th Cir. 2009), citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.,* 276 F.3d 845, 848 (6th Cir. 2002). If the moving party meets this burden, the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial. *Matsushita,* 475 U.S. at 587; *Martin v. Ohio Turnpike Comm'n.,* 968 F.2d 606, (6th Cir. 1992), *cert. denied,* 506 U.S. 1054, 113 S. Ct. 979, 122 L.Ed.2d 133 (1993).

In ruling on a motion for summary judgment (in other words, determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Interroyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied,* 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.,* 260 F.3f 574, 581 (6th Cir. 2001). "Materiality is determined by the substantive law claim." *Boyd v. Baeppler,* 215 F.3d 594, 599 (6th Cir. 2000). An issue is genuine if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics*

*& Space Admin.,* 14 F.3d 1143, 1148 (6th Cir. 1994), quoting *Anderson,* 477 U.S. at 248. Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala,* 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Simmons-Harris v. Zelman,* 234 F.3d 945, 951 (6th Cir. 2000), *rev'd on other grounds,* 536 U.S. 639 (2002). Thus, a factual dispute which is merely colorable or is not significantly probative will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States,* 991 F.2d 292, 296 (6th Cir.), *cert. denied* 510 U.S. 976 (1993); *see also, Int'l Union United Auto., Aerospace & Agriculture Implement Workers of America v. BVR Liquidating, Inc.,* 190 F.3d 768, 772 (6th Cir. 1999), *cert. denied* 529 U.S. 1076 (2000).

The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street,* 886 F.2d at 1479. A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the [non-moving party]." *Anderson,* 477 U.S. at 252. If, after sufficient opportunity for discovery, the non-moving party is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.,* 477 U.S. at 322-23. "The failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion." *Alexander v. Caresource,* 576 F.3d 551 (6th Cir. 2009), quoting *Everson v. Leis,* 556 F.3d 484, 496 (6th Cir. 2009) (citing *Skousen v. Brighton High School*, 305 F.3d 520, 528 (6th Cir. 2002)).

**Analysis**

Plaintiff Elton R. Kerr, M.D., filed this action August 10, 2007, against William W. Hurd, M.D., and Wright State Physicians, Inc. Wright State Physicians is an Ohio corporation, known at the time of its employment of Dr. Kerr as University Medical Services Association. Because that name is used on many of the relevant exhibits, the Court refers to that entity in this Decision as "UMSA."

The Complaint pleads causes of action against UMSA and Dr. Hurd in his individual capacity for breach of contract (First Cause of Action), accounting (Second Cause of Action), defamation (Third Cause of Action), tortious interference with contractual relationships (Fourth Cause of Action), civil conspiracy (Fifth Cause of Action), violation of free expression rights under the United States and Ohio Constitutions (Sixth Cause of Action), intentional infliction of emotional distress (Seventh Cause of Action), fraud (Eighth Cause of Action), violation of Ohio public policy (Ninth Cause of Action), and for attorney fees (Tenth Cause of Action). The Amended Complaint, filed after the Court granted Dr. Hurd's Motion for Judgment on the Pleadings, makes it clear Dr. Hurd is sued in his individual capacity only.

In his Memorandum in Opposition, Plaintiff has expressly abandoned his accounting (2nd) and tortious interference (4th) causes of action and they will be dismissed with prejudice on that basis. Van Noy Culpepper, trustee in Plaintiff's Chapter 7 bankruptcy proceedings, has been substituted as the party plaintiff in this case (Notation Order granting Doc. No. 20), but the Court will continue to refer to Dr. Kerr as "Plaintiff" from time to time in this Decision.

**Statement of Facts**

Elton Kerr is a medical doctor specializing in obstetrics and gynecology. He was hired by UMSA in September, 1998, as an independent contractor to provide medical services in those specialties on a part-time basis. Then, in May, 1999, he was employed by Wright State School of Medicine as an assistant professor. In addition to being employed by Wright State, he was employed as of July 1, 1999, by UMSA. That corporation is the exclusive entity through which faculty members at the Wright State School of Medicine may be employed to perform medical services.

About August 1, 2000, Dr. Hurd became a professor and chair of the Department of Obstetrics and Gynecology at Wright State School of Medicine. By virtue of that appointment, he also became head of the Department of Obstetrics and Gynecology at UMSA. He was Dr. Kerr's immediate superior in both positions, responsible for supervising both his academic and clinical work. Most of the clinical hospital work done by UMSA was at Miami Valley Hospital ("MVH"). Shortly after coming to Wright State, Dr. Hurd appointed Dr. Kerr as Director of MVH's Center for Women's Health.

As part of his contract with UMSA, Dr. Kerr was required to maintain active privileges at MVH. Sometime in 2004, he asked MVH to convert those privileges to "courtesy" privileges. He admits he knew this was a breach of his UMSA employment agreement. Also in December 2004 he accepted employment with Oxford Obstetrics and Gynecology, Inc., an additional breach of the UMSA contract because he did not obtain prior permission from the appropriate official at Wright State. He actually moved out of his offices at Wright State in November 2004. In January 2005 the University formalized his departure by terminating his faculty appointment; this had the effect of terminating his UMSA contract at the same time.

## First Cause of Action:  Breach of Contract

Although the Complaint is not clear on its face, Plaintiff's Memorandum in Opposition makes it clear there was no contractual relationship between Dr. Kerr and Dr. Hurd.  Rather, Dr. Kerr's contract, the breach of which is alleged in the First Cause of Action, was with UMSA.

Plaintiff moved for partial summary judgment on his First Cause of Action, asserting that the written employment agreement between Dr. Kerr and UMSA was clear and unambiguous and that UMSA's proffered evidence to explain how compensation was to be calculated was inadmissible parol evidence (Doc. No. 87).  In denying that Motion, the Court found as follows:

> Dr. Kerr became employed at Wright State University's School of Medicine in 1999. On July 1, 1999, he also became employed by UMSA which is the only entity through which School of Medicine faculty are permitted to receive income for providing patient care. His contract for employment with UMSA is denominated "Full Time Faculty Employment Agreement" and a copy is attached to his Affidavit (Ex. 1 to Doc. No. 87). The term of the contract which he alleges UMSA has breached is ¶ 4 which reads in part as follows:

> > **Compensation**. UMSA shall provide Physician, as compensation for Physician's employment and performance of the duties and responsibilities herein, such regular and additional compensation as Physician and the Chair of the SOM Department of primary appointment of which Physician is a member may from time to time agree. UMSA shall pay to Physician such compensation in accordance with UMSA's regular practices from time to time in effect for its physician employees.

> In his Affidavit, Dr. Kerr states that "[a]fter I was hired, I was paid the agreed upon salary." Kerr Affidavit, ¶ 4. He does not tell us what that agreed-upon salary was. He continues that he thereafter received occasional increases of pay which were agreed upon by him and the Department Chair. *Id.* He does not describe what process was used to reach the initial agreed-upon salary or what process was used to reach agreement on the increases. After Dr. Hurd became Chair of the Department of Obstetrics, he asked Dr. Kerr to agree to decreases in his

salary, to which he never agreed. *Id.* at ¶ 52.

(Decision and Order, Doc. No. 107, at 5-6.)  The Court then concluded as a matter of law:

> The contract here is unambiguous in providing that UMSA must pay Dr. Kerr whatever amount he and the Chair of the Department agree upon from time to time. The contract itself does not provide a mechanism for reaching agreement nor does it say what will happen if agreement is not reached.
>
> Dr. Kerr's implicit interpretation of the contract is that, once he and the Department Chair agreed on a salary, that salary could not be reduced without his consent. That, however, is not what the contract says and indeed the contract plainly contemplates that the compensation will be changed from time to time, leaving open the possibility of change downward as well as upward.
>
> The Court concludes the contract is ambiguous as to how the agreed-upon compensation is to be determined and therefore parol evidence is admissible to show if there was an agreed-upon process for reaching a compensation amount. UMSA has provided competent parol evidence of the existence of the process for determining compensation annually.

*Id.* at 6.

In his Memorandum in Opposition, Plaintiff makes the same arguments about parol evidence that he made in his own Motion for Partial Summary Judgment and does not offer any parol evidence of his own to the effect that the method of calculating his salary was not in accordance with the standard practice as testified to by Jocelyn Piccone (Affidavit, Ex. X to Doc. 83).  Instead, in arguing there is a genuine issue of material fact, Dr. Kerr points to the deposition testimony of Mark Stover, Plaintiff's expert witness (Doc. No. 96 at 46-48).

Mr. Stover's testimony does not create a genuine issue of material fact regarding the breach of contract claim.  He admits in his testimony that it does not take into account the factors of recovery in the impending fiscal year of deficits (i.e., excesses of salary over revenues less expenses) from prior fiscal years nor the expected decreased revenue in the impending fiscal year from the projected decreases in surgeries and calls taken by Dr. Kerr.

The Court's interpretation of the contract is consistent with the conduct of the parties.  As

UMSA points out, Dr. Kerr had worked under a reduced salary in the 2001-2002 calendar year (UMSA Motion, Doc. No. 83, at 21). Furthermore, Dr. Kerr had the right, which he exercised, to find other work if the salary was unacceptable, which is exactly what he did in November, 2004.

On the breach of contract claim, there are no genuine issues of material fact and UMSA is entitled to judgment as a matter of law.

## Third Cause of Action: Defamation

In his Third Cause of Action, Plaintiff alleges Dr. Hurd made defamatory statements about Plaintiff, for which UMSA should be held liable on a *respondeat superior* basis.

Under Ohio law, the elements of a defamation claim, whether libel or slander, are "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Harris v. Bornhorst*, 513 F.3d 503, 522 (6th Cir. 2008)[1], quoting *Akron-Canton Waste Oil v. Safety-Kleen Oil Servs.*, 611 N.E.2d 955, 962 (Ohio App. 9th Dist. 1992) (internal quotation marks omitted). "Because the determination of whether words are defamatory is a question of law, summary judgment is appropriate in defamation actions." *Id.,* quoting *Brown v. Lawson,* 169 Ohio App. 3d 430, 2006 Ohio 5897, 863 N.E.2d 215, 219 (Ohio App.1st Dist. 2006).

The parties are in agreement that the relevant statute of limitations period is one year. Ohio Rev. Code § 2305.11(A). The relevant year is thus the year before this action was initially filed in

---

[1]While the Court agrees that *Harris* is an apt citation of the Ohio law on defamation, the Court disagrees with UMSA's use of endnotes to make the citation. The use of footnotes for citations, an unfortunate departure from legal custom being championed by The Honorable Mark Painter, is bad enough for the way in which it distracts the reader from the text. Endnotes are an order of magnitude worse.

the Common Pleas Court, July 15, 2003 - July 15, 2004.[2]

In its Motion, UMSA asserts that the only proof Plaintiff has of oral defamation (slander) is inadmissible hearsay (Doc. No. 83 at 24). In response, Plaintiff points to a December, 2003, statement by Dr. Hurd to faculty and residents "that Dr. Kerr was stealing from the other physicians by improperly reading NSTs." (Doc. No. 100 at 14, citing the Ventolini Deposition at 124-25.[3]) Dr. Ventolini's testimony on cross-examination by Mr. Folkerth is as follows:

> Q. Did you ever hear Dr. Hurd refer to Dr. Kerr as a thief?
>
> A. No.
>
> Q. Did you ever hear Dr. Hurd say that Dr. Kerr was stealing when he was reading NSTs?
>
> A. Not directly but he implicated, because if you are taking productivity from somebody else and you put it under your productivities . . .
>
> Q. But you don't recall him using the word steal or thief in reference to Dr. Kerr?
>
> A. I don't remember if he used it, exact words. The meaning was that one.

*Id.*

Dr. Hurd's statement to Dr. Ventolini cannot form the basis of a slander action. There is no direct evidence that Hurd called Kerr a thief or accused him of stealing. Ventolini understood Hurd's remark to mean that Kerr was reading NSTs which should have been read by another doctor who then would have been paid or gotten credit toward being paid for doing the reading. Ohio does

---

[2]This case is a re-filing of a prior action in the Montgomery County Common Pleas Court which was dismissed without prejudice, then re-filed in this Court within the time allowed by the Ohio savings statute, Ohio Rev. Code § 2305.19.

[3]The sole reference given by Plaintiff is "Ventolini Dep. 124-25." Dr. Ventolini's deposition was docketed in several parts at different docket numbers; the docketing entries do not refer the reader to the pages included in each of those separate filings. Thus the reader must page through all of the filings until he or she finds the reference at Doc. No. 80-1 at 16-17.

not recognize slander by implication. *Osborn v. Knights of Columbus*, 401 F. Supp. 2d 822 (N.D. Ohio 2005), citing *Krems v. Univ. Hosps. of Cleveland*, 133 Ohio App. 3d 6, 12, 726 N.E.2d 1016 (Ohio App. 8th Dist.1999), and *Ashcroft v. Mount Sinai Med. Ctr.*, 68 Ohio App. 3d 359, 588 N.E.2d 280 (Ohio App. 8th Dist.1990)).

The second statement within the limitations period relied on by Plaintiff is a letter of February 6, 2004, from Dr. Hurd to Dr. Peter Barre, chief of staff at MVH. (Doc. No. 82-29, Ex. 21)

The pertinent portions of the letter read:

> The most recent case involves the treatment of patient Robin Brumett on February 3,2004. According to the resident that helped Dr. Kerr during a laparoscopic hysterectomy with incidental appendectomy, Dr. Kerr removed the appendix with a "PlasmaKinetic System" instrument without first tying the base. General surgical consultation was requested to 'assess the adequacy of this approach. As a result, the patient was returned to surgery for repeat laparoscopy on February 4,2004, and stapled closure of the appendiceal base.
>
> On January 21,2004, Dr. Kerr knowingly scheduled surgery on a patient on the Resident Service (Jessica Officer) presumed to have ovarian cancer without first obtaining a consult by our Gynecologic Oncologist, Dr. Nahhas. The patient was found to have a malignancy, but Dr. Nahhas was unavailable to give an intra operative consultation. According to Dr. Nahhas, this resulted in less than ideal staging for this patient, and potentially a repeat operation.
>
> On August 25, 2003, Dr. Kerr used a "Ligature" instrument on a private patient in labor. (Cynthia Sprinkle) despite the fact that this instrument is not approved for use in pregnancy, and none of the Berry OR nurses were familiar with its use. When asked about this case, he did not seem to realize that this was inappropriate.

*Id.*

With respect to one of the statements made in this letter – the statement in the last paragraph about the use of the Ligature machine – Dr. Kerr has admitted that the statement in not false. (UMSA Motion, Doc. no. 83, at 26-27, citing Kerr deposition at 350-352.

With respect to the entirety of Dr. Hurd's letter to Dr. Barre, UMSA claims the

communication was privileged because of the statutory privilege which protects a person providing information to a peer review committee, Ohio Rev. Code § 2305.251(D). Plaintiff responds that the privilege provided by this statute is not absolute, but qualified, relying on *Ahmed v. Univ. Hospitals Health Care SYS., Inc.*, 2002 Ohio 1823, 2002 Ohio App. LEXIS 1843 (Ohio App. 8th Dist. 2002). *Ahmed* is not a defamation case, but the face of the statute provides the privilege is qualified when it requires that any communication sought to be protected by the statute must have been made "without malice," words which denote qualified privilege.

Plaintiff argues that there is ample evidence of ill will between Dr. Kerr and Dr. Hurd and that from such ill will a jury could reasonably infer actual malice. First of all, Ohio law requires proof of actual malice by clear and convincing evidence. *A & B-Abel Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council,* 73 Ohio St. 3d 1, 651 NE 2d 1283, 1292 (1995). Second, actual malice must be shown by proving that the statements made are false and were published with knowledge of their falsity or reckless disregard for their truth. *Jacobs v. Frank*, 60 Ohio St. 3d 111, 118-119, 573 NE 2d 609 (1991). Plaintiff simply has not offered evidence from which a jury could find that any of the statements in Hurd's letter to Barre were false or made with knowledge of their falsity or reckless disregard of their truth. The fact that the MVH Quality Assurance Committee decided not to impose any sanctions on Dr. Kerr as a result of its investigation of Dr. Hurd's complaint is immaterial; it amounts to a conclusion that no sanction was warranted, rather than that the allegations were untrue.

On Plaintiff's defamation claim there are no genuine issues of material fact and UMSA and Dr. Hurd are entitled to judgment as a matter of law.

**Fifth Cause of Action: Civil Conspiracy**

In his Fifth Cause of Action for civil conspiracy, Plaintiff alleges that Dr. Hurd conspired with employees of Wright State School of Medicine, including Dr. Dunn and Ms. Piccone, to deprive him of compensation both from UMSA and the School of Medicine (Complaint, Doc. No. 1, at ¶ 60). He specifically avers that "Dr. Hurd induced UMSA and WS-SOM employees to unlawfully withhold pay, in violation of J.C. § 4113.15, and induced UMSA and WS-SOM employees to unlawfully allocate UMSA revenues and expenses to defraud Dr. Kerr and to force him to resign his position." *Id.*

A civil conspiracy under Ohio law consists of a "malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenny v. Transamerica Premium Ins. Co.*, 72 Ohio St. 3d 415, 419, 650 NE 2d 863 (1995), quoting *LeFort v. Century 21-Maitland Realty Co.*, 32 Ohio St. 3d 121, 512 NE 2d 640 (1987) citing *Minarik, supra. Williams v. Aetna Fin. Co.*, 83 Ohio St. 3d 464, 475 (1998). "Liability attaches for a civil conspiracy when a plaintiff can prove that two or more defendants agreed to injure another by unlawful action and committed an overt act in furtherance of the conspiracy." *Michigan Paytel Joint Venture v. City of Detroit,* 287 F.3d 527, 541 (6th Cir. 2002). A civil conspiracy requires an agreement between two or more persons and a concerted action to accomplish a criminal or unlawful purpose or to accomplish a lawful purpose by criminal or unlawful means. *United Rentals, Inc. v. Keizer*, 355 F.3d 399 (6th Cir. 2004). The principal element of a conspiracy is agreement among the parties. *Hampton v. Hanrahan,* 600 F.2d 600, 620-21 (7th Cir. 1979), *rev'd in part on other grounds,* 446 U.S. 754 (1980).

As noted above, UMSA had a method of calculating the salary of its physician employees for the coming fiscal year which required calculation of a "budget" by Ms. Piccone, an employee

of the School of Medicine who served as chief operating officer of UMSA. Ms. Piccone recommended to Dr. Hurd a change in the method for allocating expenses within UMSA and Dr. Hurd approved it. (Piccone Depo., Doc. No. 81, at 29-31). The relevant testimony is:

> Q And was the decision to make that change yours, your decision?
>
> A I recommended it to Dr. Hurd, and he confirmed it and approved it to be changed. We were trying to simplify the reports for the physicians.
>
> Q Did it simplify reports?
>
> A Yeah, I think it did, in terms of their understanding how things were. I think it also helped them to understand they're responsible for this private office and the department. They're the only ones that can fund it and manage it, and so if they want to take on more time in the private office, it was always available to them to do that. So it kind of helped spur on some productivity.

*Id.* at 31. Thus Ms. Piccone testified that it was she who devised the change in method of reporting. She offers no testimony that Dr. Hurd knew about it before hand or encouraged her to do it, only that he approved it after the fact. And she testifies that the purpose of the change was to simplify the reports for the physicians and perhaps to spur productivity. Dr. Kerr admits that the change affected all the physicians at UMSA, but claims it disproportionately affected him. (Kerr Depo. of June 15, 2009, Doc. No. 75, at 13.)

To prevail on a claim for civil conspiracy, Dr. Kerr would have to have some evidence that there was an agreement between Hurd and Piccone that Piccone would come up with a new formula for allocating expenses among the UMSA ob/gyn physicians, that the new formula would disadvantage Dr. Kerr, and that disadvantaging Dr. Kerr was somehow unlawful.

Plaintiff has no direct evidence of an agreement between Dr. Hurd and Ms. Piccone to harm him, but argues an agreement can be inferred from the circumstance that Ms. Piccone knew Dr. Hurd detested Dr. Kerr. (Memorandum in Opposition, Doc. No. 100, at 17.) He relies on *Gosden v. Louis*, 116 Ohio App. 3d 195 (Ohio App. 9th Dist. 1996). In that case most of the defendants

admitted in open court that they had jointly agreed to and signed a libelous letter. *Id.* at 221. Thus there was no need to infer an agreement: the parties admitted it. Plaintiff offers no authority for the proposition that a jury could properly infer the existence of an agreement between Dr. Hurd and Ms. Piccone on circumstantial evidence as thin as is presented here.

Secondly, the agreement must be to do a wrongful act. *Gosden* at 121, citing *Minarik v. Nagy*, 8 Ohio App. 2d 194, 193 NE 2d 280 (Ohio App. 8th Dist. 1963). What is the wrongful act underlying the alleged conspiracy? Plaintiff alleges "[f]raud serves as an underlying unlawful act or tort establishing a cause of action for conspiracy." (Memorandum in Opposition, Doc. No. 100, at 18) At this point in the Memorandum, Plaintiff does not identify what fraud he is relying on. Presumably it is the same claim of fraud which constitutes his Eighth Cause of Action which is considered *infra* and as to which the Court finds no liability by Defendants.

Assuming *arguendo* some inferable agreement between Dr. Hurd and Ms. Piccone, UMSA claims the benefit of the intra-corporate conspiracy doctrine (Motion, Doc. No. 83, at 32.) Plaintiff disputes the applicability of this doctrine because "Dr. Hurd's manipulation of Dr. Kerr's compensation was in his role at UMSA [whereas] Ms. Piccone was, at all times relevant hereto, a WSUSOM employee" (Memo in Opp., Doc. 100, at 18.)

A corporation cannot conspire with its own agents or employees. Where all defendants, allegedly co-conspirators, are members of the same collective entity, there are not two separate "people" to form a conspiracy. *Doherty v. American Motors Corp.*, 728 F.2d 334 (6th Cir. 1984)(antitrust case); *Hull v. Cuyahoga Valley Bd. of Ed.*, 926 F.2d 505 (6th Cir. 1991)7; *Steptoe v. Savings of America*, 800 F. Supp. 1542 (N.D. Ohio 1992); *Rennick v. Champion Int'l. Corp.,* 690 F. Supp. 603 (S.D. Ohio 1987); *Kerans v. Porter Paint Co., Inc*., 656 F. Supp. 267 (S.D. Ohio 1987), *aff''d,* 866 F.2d 431 (6th Cir. 1989); *Givan v. Greyhound Lines, Inc*., 616 F. Supp. 1223 (S.D. Ohio 1985).

The evidence establishes without dispute that, although her entire salary was paid by the Wright State School of Medicine, all actions taken by Ms. Piccone in preparing budgets for the ob/gyn physicians at UMSA were done in her capacity as chief operating officer of that entity or under some prior title with that entity. Dr. Hurd also had a named professorship at WSUSOM, but Dr. Kerr understood what was in fact the case: Piccone and Hurd in fixing his salary were acting on behalf of UMSA. UMSA is therefore preserved from any liability to Dr. Kerr for civil conspiracy, even if a conspiracy had been proved, by the intracorporate conspiracy doctrine.

There are no genuine issues of material fact on this cause of action and UMSA is entitled to judgment as a matter of law on the civil conspiracy cause of action.

## Sixth Cause of Action: Violation of Free Expression Rights
## Under the United States and Ohio Constitutions

In his Sixth Cause of Action, Plaintiff alleges that Dr. Hurd, acting in

> [H]is dual capacity as Department Chair of both WS-SOM and UMSA, subjected Dr. Kerr to harassment, unwarranted disciplinary action, and false allegations of professional misconduct in retaliation for Dr. Kerr's insistence on teaching certain gynecological surgery techniques, advocation [sic] of vaginal delivery over unnecessary cesarian procedures, and lecturing WS-SOM residents on the proper and appropriate use of forceps. Defendants have deprived Dr. Kerr of his rights of free expression and speech in academic areas, in disregard and deliberate indifference to Dr. Kerr's known rights and in violation of Dr. Kerr's right to speak freely. Dr. Kerr's exercise of his free expression rights was a motivating factor in the decisions removing Dr. Kerr from positions of responsibility, curtailing his ability to practice medicine, and reducing his compensation.

(Complaint, Doc. No. 1, at ¶¶ 63-64.) Dr. Kerr asserts liability of UMSA and Dr. Kerr in his individual capacity under 42 U.S.C. § 1983 and Article I, § 11 of the Ohio Constitution. *Id.*

UMSA asserts (1) there is no private right of action for violation of the Ohio Constitution; (2) Dr. Kerr's § 1983 claim is barred by the relevant statute of limitations; and (3) UMSA did not

act under color of state law (Motion, Doc. No. 83, at 34-37).

Dr. Hurd in his individual capacity as a former employee of Wright State School of Medicine is separately defended in this case by the Ohio Attorney General and has moved separately for summary judgment on this Eighth Cause of Action, the only claim made against Dr. Hurd in his former capacity at WS-SOM (Doc. No. 84). This Motion seeks summary judgment on this claim on the grounds that (1) the speech in question was not speech addressing a matter of public concern; (2) Dr. Kerr suffered no cognizable adverse employment action; (3) there is no causal connection between Dr. Kerr's speech and Dr. Hurd's allegedly adverse actions; and (4) Dr. Hurd is entitled to qualified immunity. *Id.*

Dr. Kerr responds to these arguments by asserting (1) the question of forceps delivery versus Cesarian section is a matter of public concern; (2) Dr. Kerr was subject to adverse action; (3) Dr. Kerr's speech as to the use of forceps was a motivating factor in Dr. Hurd's behavior; (4) UMSA's statute of limitations argument is inapplicable[4]; (5) Dr. Hurd is not entitled to qualified immunity; and (7) UMSA acted under color of state law (Memo in Opp., Doc. No. 100, at 19-34).

## State Constitutional Claim

Part of Dr. Kerr's Sixth Cause of Action is his claim that UMSA, acting through Dr. Hurd, violated his free expression rights under the Ohio Constitution, Article I, § 11. UMSA asserts there is not private right of action for a violation of the rights created by that section, relying on *Barksdale v. City of Cleveland*, 2006 U.S. Dist. LEXIS 29533 (N.D. Ohio May 5, 2006)(McHargh, M.J.). Judge McHargh relied in turn on *Provens v. Stark Cty. Bd. Of Mental Retardation and*

---

[4]Plaintiff notes that Dr. Hurd in his individual capacity as a former employee of WS-SOM does not seek summary judgment on a statute of limitations defense.

*Developmental Disabilities,* 64 Ohio St. 3d 252, 1992 Ohio 35, 594 N.E.2d 959, 961 (1992). The

*Provens* court plainly held there is no private right of action for a violation of Art.I, § 11. In

opposing the summary judgment motions, Dr. Kerr cites no law to the contrary.

Accordingly, UMSA is entitled to judgment as a matter of law on the Ohio Constitution

portion of the Sixth Cause of Action. To the extent the claim is made against Dr. Hurd in his

individual capacity as a former professor at Wright State, he is also entitled to summary judgment

on this claim.


### First Amendment and § 1983


In contrast to Ohio law, federal law does provide a right of action for violation of federal

constitutional rights. 42 U.S.C. §1983, R.S. §1979, was adopted as part of the Act of April 20, 1871,

and reads, as amended:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress , except
> that in any action brought against a judicial officer, injunctive relief
> shall not be granted unless a declaratory decree was violated or
> declaratory relief was unavailable. For the purposes of this section,
> any Act of Congress applicable exclusively to the District of
> Columbia shall be considered to be a statute of the District of
> Columbia.

The statute creates a cause of action sounding essentially in tort on behalf of any person

deprived of a federal constitutional right by someone acting under color of state law. *City of*

*Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 709 (1999); *Memphis Community*

*School District v. Stachura,* 477 U.S. 299 (1986); *Carey v. Piphus,* 435 U.S. 247 (1978). The

purpose of §1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails. *Wyatt v. Cole*, 504 U.S. 158 (1992). In order to be granted relief, a plaintiff must establish that the defendant deprived him of a right secured by the U.S. Constitution and the laws of the United States and that the deprivation occurred under color of state law. *See West v. Atkins,* 487 U.S. 42, 48 (1988); *Parratt v. Taylor*, 451 U.S. 527, 535 (1981); *Flagg Brothers Inc. v. Brooks*, 436 U.S. 149, 155 (1978).

## Statute of Limitations

In all constitutional tort actions, federal courts borrow the statute of limitations for personal torts from the State where the claim arose. *Hardin v. Straub,* 490 U.S. 536 (1989). The statute of limitations under Ohio law for actions brought pursuant to 42 U.S.C. § 1983 is two years. Ohio Revised Code §2305.10. *Nadra v. Mbah*, 119 Ohio St. 3d 305 (2008); *Banks v. City of Whitehall*, 344 F. 3d 550, 551 (6th Cir. 2003), *citing Browning v. Pendleton,* 869 F.2d 989 (6th Cir. 1989)(*en banc*). UMSA argues that, because this case was not filed until August 7, 2007, § 1983 claims for any acts before August 7, 2005, are barred by the statute[5]. (Motion, Doc. No. 83, at 35).

Dr. Kerr rejoins that his § 1983 claim is preserved by the savings statute, Ohio Rev. Code § 2305.19. That statute provides in pertinent part "In any action that is commenced or attempted to be commenced, . . . or if the plaintiff fails otherwise than upon the merits, the plaintiff ... may commence a new action within one year of. . . the plaintiff's failure otherwise than upon the merits. . . ." Plaintiff commenced an action against Dr. Hurd arising out of the same series of transactions or occurrences in suit here in the Montgomery County Common Pleas Court on July 15, 2004,

---

[5]The actual filing date is August 10, 2007.

voluntarily dismissed that case on October 5, 2006, then filed this case August 10, 2007. A voluntary dismissal without prejudice under Ohio R. Civ. P. 41 is a failure otherwise than on the merits. *Frysinger v. Leech*. 32 Ohio St.3d 38, 512 NE 2d 337 (1987)

Dr. Kerr did not plead any federal constitutional violations in his state court case. He argues, however, that the First Amendment claim is substantially the same as his Ohio Constitution claim, which he did plead in the state court case, relying on *Children's Hosp. v. Dept. of Public Welfare*, 69 Ohio St. 2d 523, 433 NE 2d 187 (1982)(Memo in Opp., Doc. No. 100, at 30). In that case the Ohio Supreme Court confirmed the general principle that the savings statute applies when the original suit and the new action are substantially the same, citing *Kittredge v. Miller* 5 Ohio C.D. 391, 1896 WL 547(Ohio Cir. 1896), affirmed without opinion, 56 Ohio St. 779; and *Burgoyne v. Moore*, 5 Ohio C.D. 522, 1890 WL 369 (Ohio Cir.1890), affirmed without opinion, 51 Ohio St. 626. However it held that the two cases in suit were not substantially the same and the savings statute did not apply. 69 Ohio St. 2d at 525. *Childrens' Hosp.* is not directly applicable here.

In *Stone v. North Star Steel Co.*, 152 Ohio App. 3d 29, 786 NE 2d 508 (Ohio App. 7th Dist, 2003), it was held that a prior negligence action was substantially the same as a subsequent employer intentional tort claim based on the same facts, "especially when the factual occurrences raised in the original complaint put the parties on notice of the type of claim asserted in the second complaint."

Most instructive is *Sherman v. Air Reduction Sales Co.*, 251 F. 2d 543 (6th Cir. 1958), in which Potter Stewart, then a judge of the Sixth Circuit, wrote for the court in finding that a new action for negligence, although it had many more specifications of negligent conduct than the prior case dismissed without prejudice, was substantially the same case. Judge Stewart concluded that the Ohio Supreme Court intended for the statute to be read broadly, citing Chief Justice Weygandt's opinion in *Greulich v. Monnin*, 142 Ohio St. 113, 50 NE 2d 310 (1943)("The statute, he said, is a 'broad and unambiguous' one which should be 'liberally construed in order that controversies shall

be decided upon important substantive questions rather than upon technicalities of procedure.'") A number of other cases hold that subsequent cases are "substantially the same" when the same facts are relied upon, but the theory of recovery has changed. *See, e.g., Jones v. St. Anthony Medical Center*, 1996 WL 70997 (Ohio App. 10th Dist. Feb. 20, 1996).

The Court is persuaded that this case is analogous to those where a party has come within the savings statute when the same facts are asserted in the second suit but alleged to give rise to liability on a new theory. UMSA was apprised that Dr. Kerr was seeking recovery on facts which he asserted violated his constitutional rights, albeit under the Ohio Constitution. Even though there was no right of recovery under the Ohio Constitution, Defendants had an opportunity to prepare a defense on the merits and gather the relevant facts.[6] Because the Court finds the savings statute to be applicable, Dr. Kerr's § 1983 claim against UMSA is not barred by Ohio Rev. Code § 2305.10.

The Court resolves UMSA's statute of limitations defense on the merits because it expressly disagrees with Dr. Kerr's claim that UMSA has somehow forfeited its statute of limitations defense, which was properly pled and on which relief was properly sought in the motion for summary judgment. An affirmative defense such as the statute of limitations is not waived by being pled and preserved for summary judgment practice.

## Color of State Law

42 U.S.C. § 1983 imposes liability only on those persons who act under color of state law. UMSA asserts that it did not.

"The principal inquiry in determining whether a private party's actions constitute 'state action'

---

[6]This Court is not advised as to whether UMSA attempted to obtain dismissal of the Ohio constitutional claim without discovery, on the grounds it did not state a claim. No such attempt was made in this case until the summary judgment motion.

under the Fourteenth Amendment is whether the party's actions may be 'fairly attributable to the state.' See *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). The Supreme Court has set forth three tests to determine whether the challenged conduct may be fairly attributable to the state in order to hold the defendants liable under section 1983. These tests are: (1) the public function test, *West v. Atkins,* 487 U.S. 42, 49-50 (1988); *Flagg Bros. v. Brooks,* 436 U.S. 149, 157 (1978); (2) the state compulsion test, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 170 (1970); and (3) the symbiotic relationship or nexus test, *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 721-26 (1961). These tests are reiterated in *Brentwood Academy v. Tennessee Secondary Schools Athletic Association,* 180 F.3d 758, 763 (6th Cir. 1999); *Ellison v. Garbarino*, 48 F.3d 192, 195 (6th Cir. 1995).

The public function test requires that "the private entity exercise powers which are traditionally exclusively reserved to the state, such as holding elections or eminent domain." *Lansing v. City of Memphis*, 202 F.3d 821 (6th Cir. 2000), quoting *Wolotsky v. Huhn,* 960 F.2d 1331, 1335 (6th Cir. 1992).

The state compulsion test requires that a state "exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." *Lansing v. City of Memphis*, 202 F.3d 821 (6th Cir. 2000), quoting *Wolotsky v. Huhn,* 960 F.2d 1331, 1335 (6th Cir. 1992).

Under the nexus test, "the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be treated as that of the state itself." *Lansing v. City of Memphis*, 202 F.3d 821 (6th Cir. 2000), quoting *Wolotsky v. Huhn,* 960 F.2d 1331, 1335 (6th Cir. 1992). State regulation, even when extensive, is not sufficient. *American Manufacturers Mutual Insurance Co. v. Sullivan,* 119 S. Ct. 977 (1999). Government funding for the private actor is not sufficient.

*Rendell-Baker v. Kohn,* 457 U.S. 830 (1982).

A private person may act under color of state law if he is a willful participant in a joint activity with the State or its agents. *United States v. Price*, 383 U.S. 787, 794 (1966). There must be a sufficiently close nexus between the state and the conduct challenged so that defendant is treated as a state actor and defendant's act is treated that of the state. *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982), *quoting Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351 (1974); *Lugar v. Edmonson Oil Co.,* 457 U.S. 922, 937 (1982). But the "[Fourteenth] Amendment erects no shield against merely private conduct, however discriminatory or wrongful." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 721(1961), *quoting Shelly v. Kraemer*, 334 U.S. 1, 13 (1948).

In asserting that UMSA acted under color of state law, Dr. Kerr emphasizes his claim that Hurd acted because of Kerr's advocacy of forceps delivery. ("Because UMSA cut Dr. Kerr's salary for advocacy of forceps in connection with his teaching at WSUSOM, UMSA acted under color of state law.") That argument is circular. It would make any private party liable under § 1983 if it retaliated against its employee for protected speech, e.g., if NCR, if it still had any employees in Dayton, fired one of them for standing up at a Dayton City Commission meeting and calling a city commissioner a Communist.

UMSA relies on *Austin v. Diaz,* 1999 U.S. App. LEXIS 26267 (6th Cir. 1999). In that case Dr. Austin was a member of the Neurosurgery Department at Harper Hospital, a private entity, and a faculty member at the Wayne State University Medical School, a state university medical school like Wright State. Dr. Fernando Diaz was Chief of the Harper Neurosurgery Department and Chairman of the Wayne State Neurological Surgery Department. Dr. Austin charged that Harper, the private entity, retaliated against him in several ways for testifying as a plaintiff's medical malpractice expert in violation of written policies adopted by Dr. Diaz's departments. Austin sued Harper, Wayne State, Diaz, and the Wayne State dean. The district court granted Harper summary

judgment "on the grounds that Harper was not of itself a state actor, and that the plaintiff failed to produce sufficient evidence to demonstrate that Harper is chargeable as a state actor by reason of any nexus or "symbiotic relationship" with WS."

> Dr. Diaz's dual positions with WS and Harper, likewise, do not establish the state's role or connection to the challenged conduct. The plaintiff has failed to produce any evidence--other than his own speculation--that Diaz was subjected to coercive power or significant overt or covert encouragement by the state in making decisions concerning the plaintiff's committee membership or title within Harper. There is no evidence that Dr. Diaz was acting in any capacity other than that as Chief of the Neurosurgery Department at Har

*Id.* at *9-10.

Defendant also relies on *Siskaninetz v. Wright State University*, 175 F. Supp. 2d 1018 (S.D. Ohio 2001), where Judge Rice held that Wright State's dismissal of a nursing student on report of bad reviews from a hospital preceptor did not render the preceptor's decision state action, making the preceptor liable under § 1983.

Judge Rice's opinion in *Siskaninetz* notes how fact-specific the analysis must be when applying the nexus test for acting under color of state law.  The facts in this case are stronger than in either *Austin* or *Siskaninetz*.  While UMSA is a private corporation, it appears that it has a very close relationship with Wright State: it appears to exist as the sole entity through which Wright State School of Medicine faculty can practice medicine.  It also appears that the chair of the parallel department at the Medical School is *ex officio* chair of the ob/gyn department of UMSA.  In *Siskaninetz* Judge Rice assumed for purpose of the summary judgment motion that an adjunct professor at the University was a state actor for § 1983 purposes and this Court makes the same assumption as to Dr. Hurd.[7]  Thus the state actor who is alleged to have had the unconstitutional animus against the Plaintiff is the very same person who, it is alleged, was in a position to give vent

---

[7]The parties have not briefed this question.

to that animus within UMSA.  In *Austin* the Sixth Circuit found there was not sufficient evidence to raise a triable issue as to the independence of Harper, the private entity, from Wayne State.  Here there is.

An additional issue not raised by the parties remains on this claim.  There is no *respondeat superior* liability under § 1983.  *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690 (1978).  On the other hand, a public entity can be liable under § 1983 if it adopts an unconstitutional policy.  *Id.*  However, an unconstitutional governmental policy can be inferred from a single decision by the highest officials responsible for setting policy in a particular area of the government's business.  *Owen v. City of Independence,* 445 U.S. 622 (1980); *Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986).  The parties have not addressed the question of whether this body of law, well developed as to political subdivisions, also applies to private corporations which employ state actors who make the corporate policy and whether in this case Dr. Hurd had that authority.

Thus there remain genuine issues of material fact on the question whether UMSA was acting under color of state law and it is not entitled to judgment as a matter of law on that issue.

### Matter of Public Concern

When a public employee alleges his employment was terminated in retaliation for protected speech, the courts must look to three elements.  First, the speech must be constitutionally protected.  Second, the defendants' adverse action must constitute an injury that would chill a person of ordinary firmness from engaging in the protected activity.  Third, the adverse action must be motivated at least in part in response to the exercise of the plaintiff's constitutional rights.  *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998).  Speech is protected if it is on a subject of public concern.  *Connick v. Myers*, 461 U.S. 138, 143 (1983). If an employee can show that he or she

engaged in protected speech and that the speech was a substantial motivating factor in the decision to act against the employee, then the burden shifts to the employer to show that the decision was for another valid reason or was so disruptive as to damage the efficiency of the public agency. *Waters v. Churchill*, 511 U.S. 661 (1994). Whether speech is on a matter of public concern is a question of law for the Court. *Banks v. Wolfe County Bd. of Educ.*, 330 F. 3d 888, 892 (6th Cir. 2003); *Rahn v. Drake Center, Inc.*, 31 F.3d 407, 411 (6th Cir. 1994). Whether speech addresses a "matter of public concern" is determined "by the content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147-48. The speech must relate to "any matter of political, social, or other concern for the community." *Id.* at 146.

Dr. Hurd argues that Dr. Kerr's advocacy of forceps deliveries does not deal with a matter of public concern[8]. He argues

> Under *Connick*, "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004). Speech on matters of public concern "involves 'issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.'" *Brandenburg v. Housing Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001). "[S]peech falling into this category includes informing the public that a governmental entity failed to 'discharge its governmental responsibilities' or 'bringing to light actual or potential wrongdoing or breach of public trust [on the part of a governmental entity or any officials therein].'" *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003), quoting *Connick*, 461 U.S. at 148. "The point of the protection afforded public employees is to allow public employees a voice on issues actually affecting and interesting the community at large." *Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958, 966 (6th Cir. 2002). The "public concern" requirement reflects "the common-sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick*, 461 U.S. at 143.

(Motion, Doc. No. 84, at 10).

---

[8]UMSA does not make this same argument. However, the speech in question is either protected speech for both Defendants or for neither.

Dr. Hurd relies on several discovery admissions of Dr. Kerr for this argument. At his deposition he characterized forceps deliveries as not "a theory of medicine. It is a way in which you practice medicine that has been time honored for many, many years. But in recent years, people have tended to want to do Cesarian sections for various reasons." (Kerr Depo. June 15, 2009, Doc. No. 75 at 140). Dr. Hurd argues that this question of the choice between vaginal deliveries with the use of forceps and Cesarian sections "does not concern the community or public at large." (Motion, Doc. No. 84, at 11.) As evidence, Dr. Hurd relies on Dr. Kerr's admissions that he has not published on the topic and that he has not discussed it except with medical professionals (doctors, nurses, operating room personnel) "because I don't discuss things like that with people that wouldn't even know what we're talking about." (Kerr Depo. June 15, 2009, Doc. No. 75 at 155).

Dr. Kerr responds that courts within the Sixth Circuit have applied a broad definition of matters of public concern, arguing

> Sixth Circuit courts have broadly applied the definition of matters of public concern. See, *e.g. Yohn v. Coleman*, 2009 WL 703202, *7 (E.D. Mich.) ("[u]ndoubtedly, academic standards for dental students earning graduate diplomas and entering the dental profession is an issue of significant public concern"), *Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1051 (6th Cir. 2001) (employee's speech about the benefits of hemp touched on a matter of public concern); *Leary v. Daeschner,* 228 F.3d 729, 737 (6th Cir. 2000) (teachers' statements about student discipline and appropriate educational programs touched on matters of public concern); *Hardy v. Jefferson Comm. College,* 260 F.3d 671, 675 (6th Cir. 2001)(professor's use of the words "bitch" and "nigger" touched on a matter of public concern in class discussion of socially controversial words); *Zerman v. City of Strongsville, Ohio*, 2006 WL 2812173 (N.D. Ohio) (speech addressing the training of firefighters touched on a matter of public concern).

(Memo in Opp., Doc. No. 100, at 18-19).

The Court finds analogous the Sixth Circuit's decision in *Cockrel v. Shelby County School District*, 270 F. 3d 1036 (6th Cir. 2001). There an "elementary school teacher was fired for inviting

an actor[9] to discuss the environmental benefits of industrial hemp, a substance that was illegal in the state, with her class." *Rodgers v. Banks*, 344 F.3d 587, 599 (6th Cir. 2003). The court held this was speech on a matter of public concern, even though the speech did not pertain to issues such as governmental malfeasance. It concluded that the contrary approach would preclude First Amendment protection for any public employee speaking as an employee. Ms. Cockrel presented the environmental benefits of industrial hemp as an alternative to logging, although possession of industrial hemp was illegal in Kentucky, probably because of its association in the minds of some state legislators with marijuana.

In *Hardy v. Jefferson Comm. College,* 260 F.3d 671 (6th Cir. 2001), a college professor used the words "nigger" and "bitch" in a classroom discussion examining the impact of such disparaging words. Resulting pressure from an African-American minister and civil-rights activist led to non-renewal of the professor's contract. The Sixth Circuit held that the speech in which the professor engaged was on a matter of public concern and that his right to speak on such subjects was clearly established; a denial of qualified immunity to the discharging college officials was affirmed. The course being taught was one on interpersonal communication.

> On July 16, he presented his standard lecture on language and social constructivism, where the students examined how language is used to marginalize minorities and other oppressed groups in society. The lecture included a discussion and analysis of words that have historically served the interests of the dominant culture in which they arise. Hardy solicited from his students examples of such terms. Among their suggestions were the words "girl," "lady," "faggot," "nigger," and "bitch." According to Hardy and other members of the class, the discussion was academically and philosophically challenging. Almost every student participated in the exercise.

*Id.* at 674-675. In reaching its conclusion, the Sixth Circuit noted that, in deciding the "public concern" question, "the court must determine 'the point of the speech in question . . . [because]

---

[9]Not just any actor, but Woody Harrelson himself.

controversial parts of speech advancing only private interests do not necessarily invoke First Amendment protection' *Id.* at 678, quoting *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177 1187 (6th Cir. 1995) (emphasis in original). The court distinguished both *Dambrot* and *Bonnell v. Lorenzo*, 241 F.3d 800 (6th Cir. 2001), because in those cases the offensive language had been used in ways likely to offend and marginalize the listeners, precisely the effect Hardy was teaching such words would be likely to have. The court concluded:

> Because the essence of a teacher's role is to prepare students for their place in society as responsible citizens, classroom instruction will often fall within the Supreme Court's broad conception of "public concern." See Gregory A. Clarick, Note, Public School Teachers and the First Amendment: Protecting the Right to Teach, 65 N.Y.U.L.Rev. 693, 702 (1990) (arguing that "[a] teacher's speech both offers students ideas and arguments that may be very much a part of public debate and teaches students the process of rational discourse that allows them to participate meaningfully in public debate). Hardy's lecture on social deconstructivism and language, which explored the social and political impact of certain words, clearly meets this criterion. Although Hardy's in-class speech does not itself constitute pure public debate, it does relate to matters of overwhelming public concern -- race, gender, and power conflicts in our society.

*Id.* at 679.

That analysis is directly applicable to this case. Dr. Kerr's advocacy of forceps-assisted vaginal delivery as opposed to Cesarian section delivery is a matter of public concern, albeit not as overwhelming as the race, gender, and power conflicts involved in *Hardy*.

As evidence that this question is newsworthy – evoking attention from national news sources – the Court notes that, on the morning this portion of the Decision is being written (March 13, 2010), the Dayton Daily News carried a story at page A7 from the Associated Press wire about a report that too many tests and surgeries, including Cesarian sections, were being done; the story was apparently written in reaction to reports about the President's annual physical. Earlier this week, National Public Radio broadcast a story about the possible reasons why women who have once had a Cesarian section are prevented by medical personnel from attempting vaginal delivery of a

subsequent child. While Dr. Kerr may not have published his thoughts on vaginal delivery, communicating them to his obstetrical students was an important vehicle to further debate on the question.

The Court concludes as a matter of law that Dr. Kerr's speech to medical students on forceps and vaginal delivery was on a matter of public concern.

## Speaker as Employee or Citizen

Dr. Hurd argues that because Dr. Kerr's speech about forceps and vaginal delivery was within his role as an employee of Wright State School of Medicine, it is not protected because the school had the right to regulate that speech. Dr. Hurd relies on *Garcetti v. Ceballos*, 547 U.S. 410 (2006), where the Supreme Court refined its Connick jurisprudence to require a role-based analysis, as well as a content based analysis. *Garcetti* holds that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421.

Without doubt, Dr. Kerr's speech as to vaginal deliveries was within his "hired" speech as a teacher of obstetrics. As Dr. Hurd notes, the Supreme Court expressly left undecided in *Garcetti* the extent to which its analysis would apply in an academic setting.[10] He notes, however, that the majority of post-*Garcetti* cases have applied its analysis in academic settings, citing *Renken v. Gregory*, 541 F.3d 769 (7th Cir. 2008); *Mayer v. Monroe County Community Sch. Corp.*, 474 F.3d

---

[10]"There is some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence. We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." *Garcetti*, 547 U.S. at 425.

477 (7th Cir. 2007); and *Borden v. Sch. Dist. of Twp. of East Brunswick*, 523 F.3d 153 (3rd Cir. 2008), *cert denied*, 129 s. ct. 1524, 173 L. Ed. 2d 656 (2009).  Dr. Kerr counters by claiming the issue is settled in this Court by *Evans-Marshall v. Bd. of Ed. of Tipp City Exempted Village Sch. Dist.*, 2008 WL 2987174 (S.D. Ohio)(Rice, J.)  In *Evans-Marshall,* Judge Rice followed *Lee v. York County Sch. Dist.*, 484 F.3d 687 (4th Cir. 2007) and *Pittman v. Cuyahoga Valley Career Ctr.*, 451 F.Supp.2d 905, 929 (N.D.Ohio 2006), and held

> Based on the explicit caveat in the majority opinion of *Garcetti* that the Court's decision therein did not necessarily apply "in the same manner to a case involving speech related to scholarship or teaching," *Garcetti,* 547 U.S. at 425, this Court agrees with the Fourth Circuit that it is not clear that *Garcetti* necessarily applies to the facts of this case. Thus, absent Sixth Circuit or further Supreme Court guidance to the contrary, this Court will continue to apply the traditional *Pickering-Connick* approach to cases involving in-class speech by primary and secondary public school teachers.

*Id.*  at *8.  In the absence of supervening case authority from the Supreme Court or the Court of Appeals, this Court is bound, under the doctrine of *stare decisis,* to follow decisions of its own judges.  *United States v. Hirschhorn*, 21 F.2d 758 (S.D.N.Y. 1927);  Henry Campbell Black, *The Law of Judicial Precedents*, §104 (1912).  Thus *Evans-Marshall* is binding precedent on this point.

Even without the binding precedent, this Court would find an academic exception to *Garcetti*.   Recognizing an academic freedom exception to the *Garcetti* analysis is important to protecting First Amendment values.   Universities should be the active trading floors in the marketplace of ideas.  Public universities should be no different from private universities in that respect.  At least where, as here, the expressed views are well within the range[11] of accepted medical

---

[11]And one must be careful defining the "accepted" range.  When the undersigned was an undergraduate, the use of leeches by doctors to "bleed" patients was regarded as the height of medieval superstition.  However, "[t]he use of leeches in modern medicine made its comeback in the 1980s after years of decline, with the advent of microsurgery such as plastic and reconstructive surgeries."  See, Wells, et al., "The Medical Leech: an Old Treatment Revisited," Microsurgery 14(s): 183-6.

opinion, they should certainly receive First Amendment protection ,particularly at the university level.  See Justice Souter's dissent in *Garcetti,* citing *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967).  The disastrous impact on Soviet agriculture from Stalin's enforcement of Lysenko biology orthodoxy stand as a strong counterexample to those who would discipline university professors for not following the "party line."

Dr. Hurd suggests that any academic freedom exception to *Garcetti* must be construed narrowly and limited to classroom teaching, relying on *Gorum v. Sessions*, 561 F.3d 179 (3rd Cir. 2009)(Motion, Doc. No. 84, at 14).  The Court finds no suggestion in the motion papers that Dr. Kerr's advocacy for forceps deliveries was outside either the classroom or the clinical context in which medical professors are expected to teach.

## Adverse Employment Action

In order to recover on his First Amendment retaliation claim, Dr. Kerr must show that he suffered an adverse employment action "sufficient to chill a person of ordinary firmness from continuing in that activity."  *Evans-Marshall*, 2008 WL 2987174 at *5, quoting *Evans-Marshall v. Bd. of Educ.*, 428 F.3d 223, 228 (6th Cir.2005) (quoting *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir.2001)).  In his argument on this point (Motion, Doc. No. 84, at 14-17),  Dr. Hurd conflates the issues of adverse action and causation.  Untangling those issues, the Court finds that there is a genuine issue of material fact whether the actions taken by Dr. Hurd against Dr. Kerr meet the adverse action test of *Cockrel*.

## Causation

As noted above, to prevail Dr. Kerr must prove that his protected speech was at least one of the motivating factors for Dr. Hurd's actions against him. This also is an issue which cannot be resolved on summary judgment. Dr. Hurd cites examples of what he calls insubordination and perhaps examples of poor clinical judgment on Dr. Kerr's part as the reasons for his actions. It is also argued that the reduction in his compensation resulted from his failure in various ways to perform adequately. However, this is not a case where a terminated employee who consistently underperformed latches onto a stray invidious remark of the allegedly discriminating employer. Rather, there is ample record evidence to show that forceps vs. Cesarian delivery was an "issue" between these two doctors. Whether Dr. Hurd was able to completely put aside that issue when deciding questions about Dr. Kerr's employment is an issue of fact a jury must decide.

## Qualified Immunity

Dr. Hurd asserts that whether or not Dr. Kerr was engaged in protected speech, the doctrine of qualified immunity protects Dr. Hurd from liability for retaliating against that speech (Motion, Doc. No. 84, at 18-19). Government officials performing discretionary functions are afforded a qualified immunity under 42 U.S.C. §1983 as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Christophel v. Kukulinsky*, 61 F.3d 479, 484 (6th Cir. 1995); *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir., 1994); *Flatford v. City of Monroe*, 17 F.3d 162 (6th Cir. 1994).

In deciding qualified immunity questions, district courts were for some years required to apply a two-part sequential analysis, first determining whether the alleged facts, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a

constitutional right, and then deciding if the right was clearly established at the time the officer acted. *Brosseau v. Haugen*, 543 U.S. 194 (2004), *Estate of Carter v. City of Detroit,* 408 F.3d 305, 310-11 (6th Cir. 2005), and *Klein v . Long,* 275 F.3d 544 (6th Cir. 2001), *both citing Saucier v. Katz*, 533 U.S. 194, 201 (2001). However, the two-step process is no longer mandated in light of experience with its use; trial judges are now permitted to use their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first. *Pearson v. Callahan*, 556 U.S. ___, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

Qualified immunity analysis involves three inquiries: (I) "whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred;" (ii) "whether the violation involved a clearly established constitutional right of which a reasonable person would have known;" and (iii) "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005), *quoting Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). Qualified immunity must be granted if the plaintiff cannot establish each of these elements. *Williams ex rel. Allen v. Cambridge Bd. of Educ.*, 370 F.3d 630, 636 (6th Cir. 2004).

In order for the violated right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he or she is doing violates that right; in light of pre-existing law, the unlawfulness of the official's action must be apparent. *Anderson v. Creighton*, 483 U.S. at 640. The right must be defined at the appropriate level of specificity to determine whether it was clearly established at the time the defendants acted. *Wilson v. Layne*, 526 U.S. 603, 615 (1999), citing *Anderson v. Creighton.* The test is whether the law was clear in relation to the specific facts confronting the public official when he acted; the constitutional right must not be characterized too broadly without considering the specific facts of the case.

*Guercio v. Brody*, 911 F.2d 1179 (6th Cir. 1990). The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Russo v. City of Cincinnati,* 953 F.2d 1036, 1042 (6th Cir. 1992). Although the very action in question need not have previously been held unlawful, its unlawfulness must be apparent in light of pre-existing law. *Id.* An action's unlawfulness can be apparent from direct holdings, specific examples described as prohibited, or from the general reasoning that a court employs. *Burchett v. Kiefer*, 310 F.3d 937 (6th Cir. 2002), citing *Hope v. Pelzer,* 536 U.S. 730 (2002).

The Court concludes Dr. Hurd's qualified immunity claim is precluded by the holding in *Hardy v. Jefferson Comm. College,* 260 F.3d 671 (6th Cir. 2001), where the Sixth Circuit expressly affirmed a denial of qualified immunity.

Based on the foregoing analysis, neither Defendant is entitled to summary judgment on Plaintiff's Sixth Cause of Action.

## Seventh Cause of Action: Intentional Infliction of Emotional Distress

In his Seventh Cause of Action, Dr. Kerr asserts Dr. Hurd's conduct toward him "was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and should be regarded as atrocious and utterly intolerable in a civilized community." (Complaint, Doc. No. 1, at ¶ 67). Dr. Kerr alleges Dr. Hurd intentionally injured him emotionally or was at least reckless in that regard. *Id.*

> In Ohio, a plaintiff claiming intentional infliction of emotional distress must show that "(1) the defendant intended to cause emotional distress or knew or should have known that its conduct would result in serious emotional distress to the plaintiff; (2) defendant's conduct was outrageous and extreme and beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; (3) defendant's conduct was the proximate cause of plaintiff's psychic injury; and (4)

> plaintiff's emotional distress was serious and of such a nature that no reasonable person could be expected to endure it." *Ekunsumi v. Cincinnati Restoration, Inc.*, 120 Ohio App.3d 557, 698 N.E.2d 503, 506 (1997); *see also Yeager v. Local Union 20*, 6 Ohio St.3d 369, 453 N.E.2d 666 (1983).

*Talley v. Family Dollar Stores of Ohio, Inc.,* 542 F. 3d 1099, 1110 (6th Cir., 2008).  It is appropriate for a district court to decide on summary judgment whether the alleged acts of a defendant rise to the level of severity required for this tort.

> To the extent that [plaintiff] suggests a district court judge cannot rule that, as a matter of law, certain conduct does not rise (or sink) to the extreme and outrageous level required to state a claim for intentional infliction of emotional distress, she attempts to prove too much.  It is well accepted that intentional infliction of emotional distress claims may entirely appropriately be dealt with on summary judgment or in a motion to dismiss.  *See, e.g., Rogers v. Targot Telemarketing Servs.,* 70 Ohio App. 3d 689, 591 NE 2d 1332, 1333, 1336 (1990)(treating plaintiff's allegations that she was falsely promised continued employment with the intention of causing her to detrimentally rely on the assurances as insufficient to qualify as extreme or outrageous); *Baab v. AMR Serv. Corp.*, 811 F. Supp. 1246, 1270 (N.D. Ohio 1993)(stating that co-workers' display of photographs of scantily clad women and plaintiff's receipt of pornographic "sex toys" was not intolerable in a civilized society and therefore not extreme or outrageous).

*Miller v. Curie*, 50 F.3d 373 at 377-78 (6th Cir. 1995).

The Court concludes that, even if Dr. Kerr can prove that Dr. Hurd did each of the acts alleged in the Complaint with the intention of inflicting emotional distress on him, those acts do not rise to the level of severity required for this tort in Ohio.  Given this conclusion, the Court need not rule on whether Dr. Kerr's evidence of the severity of his emotional distress would be adequate to survive summary judgment.  Defendants are entitled to summary judgment on the Seventh Cause of Action.

**Eighth Cause of Action: Fraud**

In his Eighth Cause of Action, Dr. Kerr alleges

> 71. At all times relevant hereto, Dr. Hurd directed that the revenues generated and expenses incurred by Dr. Kerr be allocated to minimize Dr. Kerr's contribution to UMSA's income, and Dr. Hurd intentionally or with reckless disregard concealed these allocations. Dr. Kerr depended and reasonably relied upon Dr. Hurd to assure the proper allocation of revenues generated and expenses incurred. Dr. Hurd acted in the course and scope of his UMSA employment and was able to misallocate Dr. Kerr's income and expenses through his position as Dr. Kerr's UMSA supervisor.
>
> 72. By allowing Dr. Hurd to misallocate revenues and expenses, UMSA failed to pay the compensation to which Dr. Kerr is entitled. UMSA knew or should have known of the misallocation of Dr. Kerr's income and expenses. As a direct and proximate result of the intentional concealment by Dr. Hurd and UMSA, Dr. Kerr was not paid compensation due to him in an amount not yet determined but in excess of $500,000.

(Complaint, Doc. No. 1).

The elements of an action in actual fraud in Ohio are (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance. *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St. 3d 54, 514 NE 2d 709 (1987), citing *Burr v. Stark Cty. Bd. of Commrs.*, 23 Ohio St. 3d 69, 491 NE 2d 1101, ¶2 of the syllabus (1986); and *Cohen v. Lamko, Inc*., 10 Ohio St. 3d 167, 462 NE 2d 407 (1984). See also *Graham v. American Cyanamid Co.*, 350 F.3d 496, 507 (6th Cir. 2003), citing *Burr* and *Gaines*.

As noted in UMSA's Motion (Doc. No. 83 at 43), Dr. Kerr testified on deposition about the changes in allocation of expenses and revenue generation possibilities at UMSA that Ms. Piccone drafted and Dr. Hurd approved. His claim is that, although Dr. Hurd "notified the entire department,

including Dr. Kerr, in advance that these changes were going to take place," he did not reveal to Dr. Kerr "that his compensation would be disproportionately affected." (Memo in Opp., Doc. No. 100, at 41).

As authority that such a failure to disclose can be actionable fraud, Plaintiff relies on *Mitchell v. Slocum*, 7 Ohio Misc. 2d 33, 455 NE 2d 20 (Akron Muni Ct. 1981). Judge Schneiderman in turn cites other Ohio authority for the proposition that an action in fraud will lie for failure to disclose when there is a duty to make the disclosure. *Id.* at 34-35, citing, *inter alia, Klott v. Associates Real Estate*, 41 Ohio App. 2d 118, 322 NE 2d 690 (Ohio App. 10 Dist. 1974); and *Miles v. Perpetual S. & L. Co.*, 58 Ohio St. 2d 97, 388 NE 2d 1367 (1979).

In its Reply, UMSA notes that this claim is completely undermined by Dr. Kerr's deposition testimony that he understood the change in policies would adversely impact his compensation and that it would do so disproportionately when compared with other physician employees of UMSA (Reply Memo, Doc. No. 112, at 19, and cited deposition testimony).

On the basis of the evidence cited, the Court concludes there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law on Plaintiff's Eighth Cause of Action. Plaintiff cannot prove, in contradiction to his deposition testimony, that he reasonably relied on Dr. Hurd's alleged failure to tell him that the new accounting procedures would result in a reduction in his compensation.

**Ninth Cause of Action: Violation of Ohio Public Policy**

In his Ninth Cause of action, Dr. Kerr asserts it was a violation of clearly expressed Ohio policy to protect free expression rights to retaliate against him as Dr. Hurd allegedly did for exercising those rights (Complaint, Doc. No. 1, ¶¶ 75-76).

In its summary judgment motion, UMSA notes that the Ohio courts have never recognized a common law cause of action for violation of Ohio public policy beyond the context of termination of an at-will employee (Motion, Doc. No. 83, at 12, citing *Woods v, Miamisburg City Schools,* 254 F. Supp. 2d 868, 877 (S. D. Ohio 2003)(Rice, Ch. J.)

Although the Complaint does not speak in the Ninth Cause of Action about discharge, Dr. Kerr clarifies in his Memorandum in Opposition that that is the claim being made in the Ninth Cause (Memo in Opp., Doc. No. 100, at 41-42). However, Dr. Kerr's termination as an employee of UMSA was automatic when he abandoned his teaching position at Wright State School of Medicine and there is no question that that is what he did. Defendants are therefore entitled to summary judgment on Plaintiff's Ninth Cause of Action.

**Tenth Cause of Action: Recovery of Attorney Fees, Costs, and Expenses**

In his Tenth Cause of Action, Plaintiff alleges merely that he is entitled to recover attorney fees, costs, and expenses in this action (Complaint, Doc. No. 1, at ¶ 79). Plaintiff acknowledges that, as Defendants argue, there is no separate cause of action for attorney fees under Ohio law.

Plaintiff is correct that his claim to attorney fees should not be decided on summary judgment. Should he prevail at trial on his § 1983 claim, he may be entitled to attorney fees under 42 U.S.C. § 1988 and costs and fees under Fed. R. Civ. P. 54. Nothing respecting those potential entitlements may be presented to the jury as they are exclusively a matter for the Court, post-verdict. Conversely, because summary judgment is denied on the § 1983 claim, it must also be denied on the claims for attorney fees, costs, and expenses.

**Conclusion**

Based on the foregoing analysis, the Court concludes the Defendants are entitled to summary judgment on Plaintiff's First, Second, Third, Fourth, Fifth, Seventh, Eighth, and Ninth Causes of Action and on the Ohio constitutional claim in the Sixth Cause of Action. Defendants are not entitled to summary judgment on Plaintiff's § 1983 claim in his Sixth Cause of Action. Plaintiff's Tenth Cause of Action should not have been pleaded in that manner, but Defendants are not entitled to summary judgment on Plaintiff's claims for attorney fees, costs, and expenses, which will not, however, be presented to the jury.

March 15, 2010.

s/ **Michael R. Merz**
United States Magistrate Judge